**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GWENDOLYN MITCHELL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 17-cv-00182 (APM)** |
| **JEROME H. POWELL,[1]** **Chair of the Federal Reserve** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Gwendolyn Mitchell is the Manager of Metadata and Taxonomy Operations at the Board of Governors of the Federal Reserve System, a position she has held for the past four years. Plaintiff, an African American woman, alleges discrimination by her employer on the basis of race and gender. First, she asserts that she was subjected to a hostile work environment by three of her co-workers, and that Defendant is liable for failing to act in response to her complaints. Second, she alleges that Defendant retaliated against her after she complained of this treatment by removing some of her responsibilities and transferring them to other employees. Finally, she maintains that the decision not to promote her to the role of Assistant Director was both discriminatory and in retaliation for her protected activity.

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Chair of the Board of Governors of the Federal Reserve as the defendant in this case.

Defendant seeks summary judgment as to all claims. For the reasons below, the court grants Defendant's motion as to Plaintiff's claims for hostile work environment and for non-promotion. However, Plaintiff's claim for the retaliatory removal of responsibilities can proceed to trial.

## II. BACKGROUND

### A. Factual Background

Plaintiff Gwendolyn Mitchell is the Manager for Metadata and Taxonomy Operations in the Office of the Chief Data Officer ("OCDO") at the Federal Reserve Board of Governors, a position she has held since January 2014. Def.'s Mot. for Summ. J., ECF No. 15 [hereinafter Def.'s Mot.], Def.'s Stmt. of Uncontested Facts, ECF No. 15-2 [hereinafter Def.'s Facts], ¶ 1; Pl.'s Opp'n to Def.'s Mot., ECF No. 19 [hereinafter Pl.'s Opp'n], Pl.'s Resp. to Def.'s Facts, ECF No. 19-35 [hereinafter Pl.'s Facts] (uncontested); Def.'s Ex. A, ECF No. 15-3 [hereinafter Def.'s Ex. A]. A few months into her tenure, Plaintiff began to clash with another OCDO employee, Jeff Monica, the Assistant Director for Data Strategy and Policy. Pl.'s Opp'n at 3–9; Def.'s Ex. A. As an Assistant Director, Mr. Monica outranked Plaintiff, but did not act as her supervisor. Def.'s Mot. at 2; Pl.'s Opp'n at 3; Def.'s Ex. A. During the relevant period, both Plaintiff and Mr. Monica reported directly to Michael Kraemer, the Chief Data Officer. Def's Mot. at 2–3; Pl.'s Opp'n at 3; Def.'s Ex. A.

Plaintiff recounts a series of incidents, starting in October 2014, in which Mr. Monica yelled at Plaintiff and made rude comments to her at work, often in public settings such as meetings. *See, e.g.*, Pl.'s Opp'n, Pl.'s Ex. 27, ECF No. 19-27 [hereinafter Mitchell Decl.], ¶ 17 ("Jeff demanded that I assume the sole lead role of the Taxonomy work associated with his project and drafting a project charter because he wanted 'one neck to choke.'"); *id.* ("[H]e began yelling

that he didn't care about that and that he would influence what went into my performance appraisal."); *id.* ¶ 19 ("Mr. Monica yelled at me rather than allowing me to explain what MDRM codes and what Fed names were and how important they were."); *id* ¶ 20 ("Jeff yelled at me because he was upset about the progress of the Taxonomy project and continued to discount the taxonomy and metadata work of my team."). According to Plaintiff, Mr. Monica's subordinates, Irena Zadonsky and Sridhar Dronamraju, also took actions to undermine Plaintiff's ability to do her job, including telling Plaintiff's subordinates not to work with her and excluding Plaintiff from meetings relevant to her work. *See id.* ¶ 31 ("Sridhar Dronamraju scheduled and attended EDI Lite kick-off meetings with the stakeholders without me . . . despite [my] obvious involvement in the program."); *id.* ¶ 29 ("Irena Zadonsky instructed my subordinates not to complete the visual regarding data use at the Board[, a project which had been assigned to Plaintiff's team]."); *id.* ¶ 39 ("Irena Zandosky distributed an organizational chart relating to OCDO that relegated me to a subservient role in Enterprise Taxonomy Development."); *id.* ¶ 40 ("Irena Zadonsky excluded me from a presentation by Patrick Lamb, an international taxonomy expert.").

Plaintiff also offers some evidence that Mr. Monica and his subordinates directed such behavior toward African American women in particular. *See, e.g.*, Pl.'s Opp'n, Pl.'s Ex. 1, ECF No. 19-1, at 87 (responding to a deposition question as to when she was convinced that she had been subject to discrimination, Plaintiff replied that she became aware that the "behavior [was] being . . . directed at Yinka, Bunmi and myself [all of whom are African American women]"); Pl.'s Opp'n, Pl.'s Ex 2, ECF No. 19-2 [hereinafter Pl.'s Ex. 2], at 69–70 (describing an incident where Ms. Zadonsky yelled at Ms. Atkintade, an African American woman); Mitchell Decl. ¶ 20 (stating that Mr. Monica yelled at only Plaintiff at a meeting where Plaintiff and a white woman were updating Mr. Monica on a project).

On October 6, 2015, Plaintiff and two colleagues met with Mr. Kraemer to discuss their concerns about the pattern of harassing behavior. Pl.'s Opp'n at 10; Pl.'s Ex. 1 at 92. At this meeting, Plaintiff and her colleagues discussed their belief that the behavior was motivated by discrimination based on race and sex.[2] Pl.'s Opp'n at 10; Pl.'s Ex. 1 at 92. Following this meeting, Defendant took no steps to address the issues raised. *See* Def.'s Facts (offering no examples of actions taken between October 6 and a second meeting on December 4, 2015); Def.'s Mot. (same); Def.'s Reply to Pl.'s Opp'n, ECF No. 23 [hereinafter Def.'s Reply] (same). Not surprisingly, Plaintiff continued to experience harassing behavior. In November of 2015, Mr. Monica yelled at Plaintiff in a meeting, and in a separate incident Ms. Zadonsky excluded Plaintiff and another African American female colleague from a meeting. Pl.'s Opp'n at 9, 12; Pl.'s Opp'n, Pl.'s Ex. 26, ECF No. 19-26 (email showing the exclusion from a meeting); Mitchell Decl. ¶ 33.

Additionally, Plaintiff asserts that Mr. Kraemer engaged in retaliatory actions against her after she complained to him in October 2015. Specifically, she claims that he removed certain responsibilities from her purview or countenanced such action by Mr. Monica. *See, e.g.*, Pl.'s Opp'n at 11 ("Mr. Kraemer approved the exclusion of Ms. Mitchell from the Enterprise Data Inventory Advisory Group."); *id*. ("Mr. Kraemer allowed Jeffrey Monica to completely remove Ms. Mitchell's responsibility for the modernization of the MDRM codes and Fed names, which Ms. Mitchell had been overseeing."); *id.* ("Mr. Kraemer also signed a memo supporting Mr. Monica's intention to decide all 'future planning for MDRM coding and FEDnames/Nomenclature. . . '").

[2] Defendant disputes that Plaintiff identified these alleged motivations at the meeting with Mr. Kraemer. Def.'s Mot. at 18–19, n.13. However, as Defendant correctly point out, the court must view the evidence in the light most favorable to Plaintiff as the non-moving party and therefore assumes Plaintiff raised concerns about discrimination to Mr. Kraemer. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Plaintiff raised her concerns again on December 4, 2015, in a meeting with Mr. Kraemer and Donald Hammond, Mr. Kraemer's supervisor. Def.'s Mot., Def's Ex. P, ECF No. 15-18, at 5–6. No immediate actions were taken in response to the complaints. *See* Def.'s Facts (offering no examples of actions taken between the second meeting on December 4, 2015 and "early" 2016 when a consultant was hired to conduct a "climate assessment"); Def.'s Mot. (same); Def.'s Reply (same).

In early 2016, Defendant hired a third-party contractor, ADR Vantage, to conduct a "climate assessment" of the OCDO. Def.'s Facts ¶ 27; Pl.'s Facts (uncontested). The parties dispute whether this was done in response to Plaintiff's complaints. *Compare* Def.'s Facts ¶ 27 ("[T]he OCDO engaged an outside consultant, ADR Vantage, to conduct a climate assessment . . . based on workplace tensions . . . including complaints raised by plaintiff in late 2015") *with* Pl.'s Opp'n at 26 ("Mr. Kraemer contended at his deposition that [the climate assessment] was not conducted because of Ms. Mitchell's complaints of race discrimination."). ADR Vantage released a summary report of its findings in June of 2016. Pl.'s Opp'n, Pl.'s Ex. 31, ECF No. 19-31. Defendant issued letters of reprimand based on the findings of the report to Mr. Monica, Ms. Zadonsky, and Mr. Dronamraju in August 2016. *Id.*; Pl.'s Opp'n, Pl.'s Ex. 32, ECF No. 19-32; Pl.'s Opp'n, Pl.'s Ex. 33, ECF No. 19-33.

In the spring of 2016, before release of the climate assessment results, Plaintiff applied for a promotion to Assistant Director of Data Management Business Services, also in the OCDO. Def.'s Mot, Def.'s Ex. J, ECF No. 15-12; Def.'s Ex. A. Plaintiff was one of three finalists for the position. Def.'s Facts ¶ 24; Pl.'s Facts (uncontested). Defendant ultimately selected Phil Daher, a white male who had served as the Manager for Information Management at the Federal Reserve

in another division for the preceding nine years. Def.'s Facts ¶ 17; Pl.'s Facts (uncontested); Def.'s Mot., Def.'s Ex. M, ECF No. 15-15.

Plaintiff sought Equal Employment Opportunity counseling at the end of June 2016, and filed a formal administrative complaint in July of that year. Compl., ECF No. 1 [hereinafter Compl.], ¶ 4; Def.'s Answer, ECF No. 7, ¶ 4.

**B. Procedural Background**

Plaintiff filed her complaint in this case on January 27, 2017, alleging race and sex discrimination, hostile work environment, and retaliation under Title VII. *See* Compl. The parties conducted substantial discovery, and Defendant filed this Motion for Summary Judgment as to all claims in March 2018. Def.'s Mot.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court looks at the facts in the light most favorable to the non-moving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in her favor," then summary judgment is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113

(D.C. Cir. 2016). When ruling on a summary judgment motion, courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV. DISCUSSION

### A. Non-Promotion Claim

The court begins with Plaintiff's claim for discrimination and retaliation for her non-promotion to Assistant Director in the spring of 2016. Because Plaintiff has not sufficiently rebutted Defendant's evidence of a non-discriminatory and non-retaliatory reason for this decision, the court grants Defendant summary judgment as to this claim.

Title VII prohibits federal agencies from discriminating against their employees based on race, color, or sex. *McGrath v. Clinton*, 666 F.3d 1377, 1379 (D.C. Cir. 2012); *see* 42 U.S.C. § 2000e-16(a). Title VII also makes it unlawful to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice" by the statute. *McGrath*, 666 F.3d at 1379–80 (quoting 42 U.S.C. § 2000e-3(a)).

Where, as here, a plaintiff proffers only indirect evidence of unlawful discrimination or retaliation to support her Title VII claims, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish her prima facie case. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). To state a prima facie case of race or sex discrimination in the context of an adverse selection decision, the plaintiff must demonstrate that "'(1) [s]he is a member of a protected class; (2) [s]he applied for and was qualified for an available position; (3) despite [her] qualifications [s]he was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants.'" *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *see also Holcomb*, 433 F.3d at

895. To state a prima facie case of retaliation, a plaintiff must show that "[1] she engaged in activity protected by Title VII, [2] the employer took adverse action against her, and [3] the employer took that action because of [her] protected conduct." *Walker*, 798 F.3d at 1091–92. Once the plaintiff has established her prima facie case, the burden shifts to the employer, who must identify some "legitimate, non-discriminatory or non-retaliatory reason" for the employment action, *see id.* at 1092, which the plaintiff can rebut by showing that the employer's stated reason is "merely pretext," *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014).

This framework, however, is modified at the summary judgment stage: "[O]nce the employer has claimed a nondiscriminatory reason for its actions, th[e] burden-shifting framework disappears." *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016); *see also Jones v. Bernanke*, 557 F.3d 670, 677–78 (D.C. Cir. 2009) (applying same rule in retaliation context). The question becomes "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker*, 798 F.3d at 1092 (internal quotation marks omitted); *see also Brady*, 520 F.3d at 493–94 ("[O]nce the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Here, Defendant has provided a non-discriminatory, non-retaliatory reason for its decision to promote Mr. Daher over Plaintiff. All parties agree that management and supervision responsibilities were critical to the Assistant Director role. Def.'s Facts ¶¶ 19–21; Pl.'s Facts (uncontested). Defendant asserts that it selected Phil Daher, a white male, for the position over Plaintiff because he possessed more management experience and he impressed during the

interview. Def.'s Mot. at 8 ("Mr. Daher was selected for the position based on the strength of his interview answers and his 'nine years experience as a manager of a section with significant data management responsibilities.'").

Plaintiff attempts to show this proffered reason is a pretext for discrimination or retaliation in two ways. First, Plaintiff asserts that she was more qualified for the Assistant Director position than Mr. Daher. Pl.'s Opp'n at 19, 22. Specifically, Plaintiff argues "it is unclear why Defendant would choose to select for this Officer position an employee with no data management experience rather than the candidate with significant expertise in the subject matter area, positive performance evaluations, [and] strong interview skills." *Id.* at 22. Second, she claims that discrepancies in Defendant's asserted reasons for selecting Mr. Daher provide evidence of discrimination. *Id.* at 22–24. The court finds neither argument persuasive.

*1. Better Qualified*

"A plaintiff may demonstrate that an employer's proffered non-discriminatory reason is pretextual by offering evidence regarding [her] qualifications in comparison to those of the individual or individuals selected." *Coleman v. Johnson*, No. 12-CV-01352 (APM), 2015 WL 4751022, at *5 (D.D.C. Aug. 11, 2015), *aff'd*, No. 15-5258, 2016 WL 3040902 (D.C. Cir. May 18, 2016) (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)). Although "a disparity in qualifications, standing alone, can support an inference of discrimination," it can do so "only when the qualifications gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate." *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (quoting *Holcomb*, 433 F.3d at 897); *see also Adeyemi v. District of Columbia*, 525 F.3d

1222, 1227 (D.C. Cir. 2008) (stating that "the qualifications gap must be 'great enough to be inherently indicative of discrimination'") (quoting *Jackson*, 496 F.3d at 707).

In this case, the gap in qualifications is not so great as to give rise to an "inference of discrimination." Plaintiff does not dispute that Mr. Daher had more overall management experience. Plaintiff had been a manager for approximately two years at the Federal Reserve Board when she applied to the Assistant Director position. Def.'s Mot, Def.'s Ex. B, ECF No. 15-4, at 181; Def.'s Facts ¶ 26; Pl.'s Facts at 4 (uncontested). Before her position at the Board, Plaintiff had worked in various capacities in the financial and data sectors, but had last supervised employees approximately 14 years earlier, from May 1999 to April 2000. *See* Def.'s Mot, Def.'s Ex. C, ECF No. 15-5 (Plaintiff's resume). Mr. Daher, by contrast, had been the manager of a section at the Board for nine years at the time of his application. Def.'s Ex. B, ECF No. 15-4, at 181; Def.'s Facts ¶ 26; Pl.'s Facts at 4 (uncontested). This seven-year difference in management experience undermines Plaintiff's assertion that she was more qualified for the position than Mr. Daher.

Acknowledging the disparity in general management experience, Plaintiff takes a different tack. She asserts that the position called for expertise in the subject area of data management, whereas Mr. Daher's experience was in a different area, data analytics. Pl.'s Opp'n at 23–24 (arguing that "data analytics is not the same as data management"; "[d]ata managers name, classify, and organize data, whereas data analysts are users of the data after it has been organized") (citing DAMA International, Data Management Body of Knowledge, 17-19 (2nd Ed. 2017)). Defendant disputes this distinction, responding that data management and data analytics are "highly interrelated concepts" and "data analysis is a critical component of data management." Def.'s Reply at 5 (citing DAMA International, Data Management Body of Knowledge, Chapter

16 § 7.2 (2d Ed. 2017)). The court need not, however, grapple with such fine-grained distinctions. Courts should not sit as a "super-personnel department" when examining an employer's decision between two similarly qualified applicants. *See Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999). Even assuming there is some degree of distinction between data management and analytics, Mr. Daher's experience was clearly in a related field. Indeed, Plaintiff herself admitted that "reasonable minds [could] disagree about whether [Plaintiff]… or Phil Daher [was] the most qualified for the position." Def.'s Ex. B at 183. Given this concession, and Mr. Daher's more extensive general management experience, no reasonable jury could find that Plaintiff was "significantly better qualified for the job." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998).

*2. Differing Explanations*

Plaintiff also urges that Defendant's "conflicting statements" about Mr. Daher's experience and the reasons for his selection give rise to an inference of discrimination. Pl.'s Opp'n at 22–23. But none of the discrepancies she cites rise to the level of conflicting explanations. For instance, she notes that the candidate evaluation form completed contemporaneously with the selection process states that Mr. Daher was chosen because of his "determination, conviction and conveyance of *passion* about being part of the new office . . . ," while other sources, including Mr. Hammond's Affidavit and a chart summarizing comments of interviewers, do not discuss Mr. Daher's "passion." Pl.'s Opp'n at 22–23 (emphasis added). Such a trivial difference in wording does not, however, give rise to an inference of discrimination.

Additionally, the very sources cited by Plaintiff exhibit a consistency in rationales for Mr. Daher's selection. For example, both the candidate evaluation form and Mr. Hammond's Affidavit note Mr. Daher's managerial experience and his data management experience.

*See* Def.'s Mot, Def.'s Ex. N, ECF No. 15-16; Def.'s Ex. P at 4–5. Likewise, Mr. Hammond, in his Affidavit, cites the strength of Mr. Daher's interviews as a factor in his hiring, Def.'s Ex. P at 4–5, and a chart summarizing interviewers says the same (though interviewers found Plaintiff to be a strong candidate as well), Def.'s Mot., Def.'s Ex. K, ECF No. 15-13. In short, the record does not feature the type of inconsistent explanations for hiring Mr. Daher that would support a reasonable inference of pretext.

Finally, Plaintiff takes aim at the "discrepancy" between Mr. Hammond's testimony that Mr. Daher had strong experience in "managing data analytics" and her own assertion that "data analytics is not the same as data management." Pl.'s Opp'n at 23 (citing Pl.'s Ex. 5, at 145). This is the same argument the court has already rejected, and the additional assertion that this is also a discrepancy does not change the analysis.

* * *

Plaintiff has not come forward with sufficient evidence to establish that Defendant's proffered reasons for Mr. Daher's selection are a pretext for discrimination or retaliation. The court therefore grants Defendant's motion for summary judgment as to these claims.

**B. Hostile Work Environment**

The court next turns to Plaintiff's hostile work environment claim. Defendant argues first that the harassment Plaintiff complains of does not rise to an actionable hostile work environment claim. Def.'s Mot. at 10–14. Defendant further asserts that, even if this were not the case, Defendant cannot be held liable because it was not negligent in its response to her complaints. *Id.* at 14–16. The court need not address the second point, because it agrees that Plaintiff has failed to provide evidence of actions sufficient to constitute a hostile work environment.

"To prevail on [a hostile work environment] claim [under Title VII], a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In support of her hostile work environment claim, Plaintiff points primarily to incidents in which Mr. Monica or his subordinates yelled at her or undermined her ability to perform certain responsibilities. *See, e.g.,* Pl.'s Opp'n at 7 ("[Mr. Monica] yelled at [Plaintiff] and told her she didn't know what she was talking about and that the codes weren't important."); *id*. at 8 ("Mr. Monica found another opportunity to yell at Ms. Mitchell about Enterprise class taxonomy."); *id*. at 9 ("[Mr. Monica] accused Ms. Mitchell of not understanding Enterprise Taxonomy and regularly yelled at her."); *id.* at 5–6 ("Mr. Dronamraju . . . did not invite Ms. Mitchell . . . to the kick-off meeting held on July 24, 2015."); *id*. at 6 ("Ms. Zadonsky and Mr. Dronamraju 'openly mocked' Ms. Mitchell and the research librarian who supported her.").

Though these and other incidents surely made Plaintiff's day-to-day unpleasant, they do not rise to the level of a hostile work environment. The Supreme Court has held that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In that vein, the D.C. Circuit "has found that even constant yelling and hostile behavior, and isolated references to a protected status may be insufficient to support a hostile work environment claim." *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 224 (D.D.C. 2010), *aff'd*, 407 F. App'x 490 (D.C. Cir. 2011) (citing *George v. Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005) (concluding that multiple occasions where the plaintiff was shouted at by three separate employees, told to "go back where [she] came from" and that she

"should never have been hired," and assigned clerical duties that white males were never required to perform did not rise to the level of severity necessary to find a hostile work environment)); *see also Gray v. Foxx*, 637 F. App'x 603, 605, 608 (D.C. Cir. 2015) (evidence that supervisor "yelled and screamed" at plaintiff during her employment was not sufficient to establish a hostile work environment); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting."). This case presents no special circumstances that would warrant deviating from this authority. *Cf. Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (holding that alleged use of a "deeply offensive racial epithet when yelling" at the plaintiff was sufficient to make out a hostile work environment claim).

Plaintiff's allegation that on one occasion Mr. Monica demanded that Plaintiff work as the only lead on a specific project, "yelling at her that he wanted only 'one neck to choke,'" Pl.'s Opp'n at 7; Mitchell Decl. ¶ 17, does not change the analysis. One isolated incident of threatening behavior, particularly one that does not involve direct proof of discrimination, does not provide sufficient support for her claim. *See Baloch*, 550 F.3d at 1195, 1199, 1201 ("[P]rofanity-laden yelling" by supervisor on many occasions, including one instance where supervisor "threatened to have [plaintiff] arrested, led out of the building in handcuffs, and jailed" were "not so 'severe' or 'pervasive' as to have changed the conditions of [the plaintiff's] employment.").

As additional proof of hostility, Plaintiff offers that Mr. Monica and Mr. Kraemer, along with Mr. Monica's subordinates on certain occasions, removed some of Plaintiff's responsibilities and took actions to prevent her from being able to work on certain projects. Pl.'s Opp'n at 11–12. As the court reads her Complaint and her opposition to this motion, these events primarily

comprise her retaliation claim, not her hostile work environment claim. In any event, even considering these actions as part of the hostile work environment claim, her claim still falls short. The removal of responsibilities generally does not support a hostile work environment cause of action. *See Veitch v. England*, 471 F.3d 124, 130–31 (D.C. Cir. 2006) (holding that non-selection for a desirable position, assignment to undesirable duties, sharing a small office, and being criticized did not make out a hostile work environment claim); *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 7 (D.D.C. 2008) (finding no hostile work environment where plaintiff's "job responsibilities were continually changed and downgraded, and . . . she was not treated like a professional in that she was asked to do tasks below her job title, [was] asked to sit in the reception area, and [was] told how to organize her desk"); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 206 (D.D.C. 2011) ("Plaintiff's frustration with . . . perceived interference with her job responsibilities amounts to nothing more than typical employment grievances and ordinary workplace conflict.").

Because Plaintiff's allegations, even read in the light most favorable to her, do not amount to a hostile work environment as a matter of law, the court grants summary judgment on this claim in favor of Defendant.

**C. Retaliation**

Finally, the court turns to Plaintiff's retaliation claim. Plaintiff argues that she faced retaliation both in the form of her non-promotion to Assistant Director and by Defendant's removal of certain job responsibilities. The court already has addressed her retaliation claim for non-promotion and therefore need not repeat that analysis here. As to her claim premised on the removal of responsibilities, Defendant argues that Plaintiff (1) has not identified an adverse action, (2) has not shown retaliatory intent, and (3) improperly relies on the same facts to establish both retaliation and a hostile work environment. Def.'s Mot. at 17–20. Each argument lacks merit.

Defendant first's contention—that the removal of some job responsibilities is not an adverse action, Def.'s Mot. at 17–18—is not supported by case law. "Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question." *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (holding that whether reassignment of responsibilities constituted materially adverse action was question for jury); *see also Houston*, 680 F. Supp. 2d at 222 ("Because a reasonable jury could find that Houston suffered from diminished . . . responsibilities, Houston has provided sufficient evidence to establish that she has suffered an adverse employment action.") (cleaned up). Plaintiff has offered unrebutted evidence of reduced duties to create a genuine dispute of fact as to the element of adversity.

Defendant next asserts that Plaintiff has not established retaliatory intent. But the short time that elapsed between Plaintiff's protected activity and the retaliation she suffered is sufficient to show causation at this stage. *See Jones*, 557 F.3d at 680 ("[W]e have repeatedly held that an adverse action following closely on the heels of protected activity may in appropriate cases support an inference of retaliation even when occurring years after the initial filing of charges."); *see also Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) ("Temporal proximity can indeed support an inference of causation, but only where the two events are 'very close' in time.") (internal citations omitted). Plaintiff engaged in protected activity when she reported to Mr. Kraemer in October of 2015 and to Mr. Kraemer and Mr. Hammond in December of 2015 that she was being harassed by Mr. Monica and his subordinates based on her race and gender. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015). Barely a month passed between Plaintiff's first protected action and the first instance of Mr. Kraemer acting to remove Plaintiff's responsibilities. Pl.'s Opp'n at 11 ("[I]n November [2015], Mr. Kraemer approved the exclusion

of Ms. Mitchell from the Enterprise Data Inventory Advisory Group."). Mr. Kraemer took additional actions in December of that year, including removing Plaintiff from another project Plaintiff had been overseeing. Mitchell Decl. ¶ 34 ("On December 3, 2015, Jeffrey Monica sent an email indicating that he and Mr. Kra[e]mer were removing my responsibility for the modernization of nomenclature assignments and the enterprise taxonomy. Mr. Monica, with Mr. Kraemer's approval, moved it to his own supervision."); Pl.'s Opp'n at 11 ("That day, Mr. Kraemer also signed a memo supporting Mr. Monica's intention to decide all 'future planning for MDRM coding and FEDnames/Nomenclature' . . .") (citing Pl.'s Ex. 13 at 6; Pl.'s Ex. 11). Such a short time clearly meets the requirements for temporal proximity, which is sufficient to show causation at this stage. *See Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (concluding that whether causal connection existed where one month separated the denial of a promotion and the filing of plaintiff's appeal for employment discrimination was question for finder of fact).

Defendant's arguments to the contrary are unavailing. First, Defendant contends that in fact many months passed between the protected activity and the adverse event. Def.'s Mot. at 10 ("[A]ny claim based on temporal proximity fails because the June 2016 non-selection occurred many months after plaintiff claims she engaged in protected activity in October 201[5]"). Not so. As discussed, Plaintiff claims to have been stripped of responsibilities within a month of her first complaint. Next, Defendant insists that "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Id*. (quoting *Woodruff*, 428 F.3d at 529). That is a correct statement of the law, but it applies only when the employer comes forward with a non-discriminatory reason for the adverse action. Defendant has not done so here. *See* Def.'s Mot.; Def.'s Reply. Thus, Plaintiff need only provide enough evidence of causation to

make out her prima facie case, which she has done here based on temporal proximity. *See Hamilton*, 666 F.3d at 1357 ("For purposes of establishing a prima facie case of retaliation, temporal proximity can indeed support an inference of causation, but only where the two events are very close in time.") (cleaned up).

Finally, Defendant asserts that Plaintiff's retaliation claim fails because it relies upon some of the same events that comprise her hostile work environment claim. *See* Def.'s Mot. at 19. That argument suffers from two flaws. First, while there are a handful of examples of overlap between the claims as articulated in the Complaint—the court counts only two—Plaintiff mostly alleges separate instances of harassing conduct. *Compare* Compl. ¶ 9 *with id.* ¶ 11; *see also* Pl.'s Opp'n at 4–9, 11–18. Second, nothing prevents Plaintiff at this stage from supporting alternative theories of liability based on overlapping facts. It is therefore entirely appropriate for her to contend that some of the same acts that she asserts were motivated by race or gender animus also were retaliatory. Plaintiff's retaliation claim may proceed to trial.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. The parties shall appear for a status hearing to discuss future proceedings on January 9, 2019, at 2:30 p.m. in Courtroom 10.

Dated: December 24, 2018

Amit P. Mehta
United States District Judge